**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>David M. Tidd<br>& Rilla J. Tidd,<br><br>                    Debtors | Chapter 7<br>Case No. 14-10089 |
| Anthony J. Manhart,<br>Chapter 7 Trustee,<br><br>                    Plaintiff<br>  v.<br><br>S.W. Collins Company,<br><br>                    Defendant | Adv. Proc. No. 16-1002 |

**MEMORANDUM OF DECISION**

Anthony J. Manhart, the chapter 7 trustee, seeks to avoid certain transfers from the debtors, David and Rilla Tidd, to S.W. Collins Company under 11 U.S.C. § 547 and to recover the value of the transfers from S.W. Collins under 11 U.S.C. § 550. [Dkt. No. 1.] S.W. Collins concedes that the transfers are preferences under section 547(b), but asserts affirmative defenses of contemporaneous exchange of new value under 11 U.S.C. § 547(c)(1) and ordinary course of business under 11 U.S.C. § 547(c)(2). [Dkt. No. 8, 33.] The parties submitted their dispute for decision on a stipulated record.

The transfers are not insulated under section 547(c)(1) because S.W. Collins has not established the amount of new value given to the debtors. However, the transfers are shielded from avoidance by section 547(c)(2) because the debtors incurred the underlying debts in the

ordinary course of their business with S.W. Collins and made the transfers that extinguished those debts in the ordinary course of their business with S.W. Collins.  Judgment will enter in favor of S.W. Collins and against the trustee.

### I.    BACKGROUND

The parties submitted a stipulation of uncontested facts and a series of incorporated exhibits.  [Dkt. No. 28.]  The following findings are drawn from the stipulation and the exhibits.[1]

David has historically conducted business under several names, including The Light House.[2]  In his business operations, David purchased materials from S.W. Collins on credit.  His purchases typically related to small home repair jobs, but he had also engaged in a house building project in years past.  For each transaction on David's account, S.W. Collins generated an invoice describing the items purchased, designating the project to which the items related, and identifying the person using the account.  S.W. Collins also issued David an account statement on the last day of each month and granted him a discount if the statement was paid in full by the due date, which fell on the tenth day of the subsequent month.

The following table summarizes the statements that S.W. Collins issued to David in 2013.  As the table shows, David paid all but one of these statements in time to receive a discount.

---

[1] For the purposes of this decision, the Court treats the stipulated facts as true.  When, as here, a dispute is presented for decision on a stipulated record, the Court is tasked with determining any significant issues of fact that the record presents.  Boston Five Cents Sav. Bank. v. Sec'y of the Dep't of Hous. & Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985).  To the extent that the meaning of the stipulation is unclear, its interpretation "is primarily a matter of ascertaining the intent of the parties."  See WO Co. v. Benjamin Franklin Corp., 562 F.2d 1339, 1344 (1st Cir. 1977).

[2] Although one part of the stipulation indicates that the debtors were engaged in business together, other parts of the stipulation suggest that David was in business alone.  See [Dkt. No. 28].  The debtors' Schedule J also indicates that Rilla was disabled at the time of the petition, and that David conducted business as a self-employed carpenter.  [Case No. 14-10089, Dkt. No. 1.]  There is no evidence that David had any ownership interest in any entities.  As a result, the Court infers that The Light House was a trade name used by David, and the Court refers to David where the stipulation otherwise refers to The Light House.  At times, the Court also refers to David where the stipulation otherwise refers to both debtors.

| Statement Date | Due Date | Amount Due if Paid Within 10 Days | Amount Paid | Payment Date |
|---|---|---|---|---|
| 1/31/2013 | 2/10/2013 | $68.96 | $68.96 | 2/8/2013 |
| 2/28/2013 | 3/10/2013 | $192.63 | $208.26 | 3/22/2013 |
| 3/31/2013 | 4/10/2013 | $341.49 | $341.49 | 4/10/2013 |
| 4/30/2013 | 5/10/2013 | $67.50 | $67.50 | 5/7/2013 |
| 5/31/2013 | 6/10/2013 | $214.37 | $214.37 | 6/5/2013 |
| 6/30/2013 | 7/10/2013 | $169.44 | $169.44 | 7/8/2013 |
| 7/31/2013 | 8/10/2013 | $652.37 | $652.37 | 8/6/2013 |
| 8/31/2013 | 9/10/2013 | $713.39 | $713.39 | 9/6/2013 |
| 9/30/2013 | 10/10/2013 | $1,727.64 | $1,727.64 | 10/7/2013 |
| 10/31/2013 | 11/10/2013 | $19,161.78 | $19,161.78 | 11/8/2013 |
| 11/30/2013 | 12/10/2013 | $19,812.27 | $19,812.27 | 12/10/2013 |
| 12/31/2013 | 1/10/2014 | $6,441.74 | $6,441.74 | 1/9/2014 |

The invoices for David's account in 2013 show that David's son, Andy Tidd, regularly used David's account to purchase materials for multiple projects. Throughout that year, Andy used David's account more often than David did. In late 2013, Andy became the general contractor on a job building a house for the debtors' relatives, Emery and Dayna Lincoln (the "Lincoln Project"). David did not work on the Lincoln Project, but he permitted Andy to use his account with S.W. Collins to buy materials for the Lincoln Project. S.W. Collins continued to send David monthly statements for materials purchased on his account, and David continued to pay those statements in full and on time. David sent Emery invoices for the materials committed to the Lincoln Project, and Emery paid those invoices by checks payable to David.

David and Rilla Tidd commenced a joint chapter 7 case on February 7, 2014 (the "Petition Date"). In the ninety days before the Petition Date, David paid, in full and on time, four monthly account statements from S.W. Collins by issuing four checks, totaling $46,001.96. These payments were in exchange for materials that S.W. Collins provided on credit in October, November, and December 2013, and January 2014. These statements and the related invoices reflect a number of small and large purchases for materials committed to the Lincoln Project and a number of small purchases for materials committed to other projects as well.

## II.  DISCUSSION

The Code permits the trustee to avoid preferential transfers under section 547(b):

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
>   (1) to or for the benefit of a creditor;
>   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>   (3) made while the debtor was insolvent;
>   (4) made –
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>   (5) that enables such creditor to receive more than such creditor would receive if –
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C § 547(b). "A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the . . . estate." Union Bank v. Wolas, 502 U.S. 151, 160-61 (1991) (quoting H.R. Rep. No. 95-595, at 177 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138). Avoidance of preferences discourages creditors from "racing to the courthouse to dismember the debtor during his slide into bankruptcy" and

facilitates "the prime bankruptcy policy of equality of distribution among creditors of the debtor." Id. at 161 (quoting H.R. Rep. No. 95-595, at 177-78).

The parties agree that, but for S.W. Collins' defenses, David's payments to S.W. Collins in the ninety-day period before the Petition Date would be avoidable as preferential transfers. S.W. Collins, however, asserts defenses under section 547(c)(1) and (c)(2):

> (c) The trustee may not avoid under [section 547] a transfer –
>   (1) to the extent that such transfer was –
>     (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>     (B) in fact a substantially contemporaneous exchange; [or]
>   (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –
>     (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>     (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(1)-(2). The contemporaneous exchange of new value defense and the ordinary course of business defense are both "designed to encourage creditors to continue to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment." Barnhill v. Johnson, 503 U.S. 393, 402 (1992). The defenses "further the goal of enabling debtors to rehabilitate themselves by insulating normal business transactions from the trustee's avoidance power." O'Neill v. Nestle Libbys P.R., Inc., 729 F.2d 35, 37 (1st Cir. 1984). But for these defenses, "creditors would be reluctant to conduct business with a struggling enterprise for fear that any payments made by the debtor could later be avoided." Id. S.W. Collins bears the burden of proving, by a preponderance of the evidence, that one of these defenses applies. See 11 U.S.C. § 547(g); Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 90 (Bankr. D. Del. 2015).

**A.    Ordinary Course of Business**

The ordinary course of business defense is designed to leave normal financial relations undisturbed because such relations do not thwart the general policy of preference recovery, which aims to "discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." O'Neill, 729 F.2d at 37 (quoting S. Rep. No. 95-989, at 88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874).  As set forth above, a creditor may be shielded from preference liability under the ordinary course of business exception only "to the extent that [the] transfer [at issue] was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2).  The creditor must also prove that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee," or "made according to ordinary business terms." Id.[3]

Although the trustee cast his arguments in terms of whether the *transfers* were made in the ordinary course, the substance of his contentions seems to relate to whether the underlying *debts* were incurred in the ordinary course.  The trustee contends that the ordinary course of business defense is inapplicable because David did not usually engage in house building projects and incur substantial debts buying materials to build houses, but instead engaged in house repair

---

[3] "The 2005 amendments made it easier to invoke the ordinary course of business defense successfully in a preference action." 5-547 Collier on Bankruptcy ¶ 547.04[2] (16th ed. 2017). Before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), a creditor relying on section 547(c)(2) had to prove: "(i) that the preferential transfer paid a debt incurred in the ordinary course of the debtor's business; (ii) that it was made in the ordinary course of business . . . of the debtor and the transferee; *and* (iii) that it was made according to ordinary business terms." Wiscovitch-Rentas v. Villa Blanca VP Plaza, LLC (In re PMC Mktg. Corp.), 543 B.R. 345, 356-57 (B.A.P. 1st Cir. 2016) (quotation marks omitted). In the wake of BAPCPA, a creditor relying on section 547(c)(2) "must still prove that the *debt* was incurred in the ordinary course of the debtor's business" but "the remainder of the test is now disjunctive." Id. (quotation marks omitted).  Because BAPCPA's only substantive change to section 547(c)(2) was the deletion of the conjunctive "and" and the substitution of the disjunctive "or," pre-BAPCPA case law discussing the meaning of section 547(c)(2) is still instructive, except to the extent that the case law requires satisfaction of the conjunctive test. *See* 5-547 Collier on Bankruptcy ¶ 547.04[2].

jobs and spent more modest sums on materials for home repair projects.  The trustee also asserts that the defense is inapplicable because David allowed Andy to incur debts during the preference period to buy materials for a project that David did not work on.

S.W. Collins responds that it "is not that out of the ordinary for a contractor that normally does smaller jobs to take on a larger project, since the work is still carpentry and still requires supplies commonly sold to contractors by supply houses like [S.W. Collins]."  [Dkt. No. 33.] S.W. Collins also asserts that the transactions that Andy was involved in during the preference period were ordinary because those transactions, like all of David's other transactions, involved the purchase and sale of contractor's materials.  Regardless of the parties' specific arguments with respect to the ordinary course defense, the Court will address each element of the defense to determine whether S.W. Collins has met its burden of proof.

### 1. Debt Incurred in the Ordinary Course

The element of incursion of debt in the ordinary course focuses on the nature of the transaction creating the debt and whether that transaction was ordinary.  Martino v. Miszkowicz (In re Miszkowicz), 513 B.R. 553, 562 (Bankr. N.D. Ill. 2014); Rice v. Hydro Temp Corp. (In re GS Inc.), 352 B.R. 858, 864 (Bankr. E.D. Ark. 2006).  Where the debtor and the transferee have a prior history of interaction, this element is satisfied if the debt is the result of an arms-length transaction and ordinary in relation to past practices between the debtor and the transferee. Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.), 482 F.3d 1118, 1124 (9th Cir. 2007) (citing Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.), 971 F.2d 396, 398 (9th Cir. 1992)).  For a transaction to qualify, it "need not have been common; it need only be ordinary." Campbell v. Cannington (In re Economy Milling Co.), 37 B.R. 914, 922 (D.S.C. 1983).  The statute does not define "ordinary," but the term is given some meaning by the general purpose of

preference law—discouraging unusual actions by debtors and creditors in the run up to bankruptcy—and by the purpose of the ordinary course defense—protecting transactions that do not seem unusual in the business operations of debtors and their creditors.  *See* WJM, Inc. v. Mass. Dep't of Pub. Welfare, 840 F.2d 996, 1010 (1st Cir. 1988), *abrogated in part on other grounds by* Reopell v. Massachusetts, 936 F.2d 12 (1st Cir. 1991).

As the trustee observes, the debts incurred on David's account with S.W. Collins in October, November, and December 2013, and January 2014 were larger than the debts incurred on David's account in the preceding nine-month period.  The materials purchased for the Lincoln Project in late 2013 and January 2014 were, in some respects, different from the materials that David purchased for other jobs.  During the preference period, David's son, Andy, also used David's account to obtain materials for a project that David did not work on.

But, despite the uptick in the amount of debt incurred on David's account during the end of 2013 and beginning of 2014, there is no indication that the size of the debt represented purchases that were being made only because the debtors were experiencing economic distress. *Cf.* Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.), 798 F.3d 983, 989 (10th Cir. 2015) ("When the new debt is very large and unprecedented, it may represent an expenditure . . . that is being undertaken only because the debtor is sliding into bankruptcy.").  To the contrary, the size of the purchases increased during this time because David's account was being used to buy materials to build a house.  David had built a house in the past; in doing so, he purchased materials for use in building houses.[4]  Moreover, the statements for David's account from October 2013 to January 2014 show that roughly one-third of the transactions during the

---

[4] The parties' stipulation does not expressly provide that David previously purchased materials to build a house; it provides only that he (or one of his relatives) built a house in the past.  However, in deciding a matter on a stipulated record, the Court can make factual findings based on the inferences permitted by the record.  Accordingly, the Court finds that David previously purchased materials to build a house.

preference period related to the purchase of materials for jobs other than the Lincoln Project. Finally, although the trustee asserts that it was out of the ordinary for David to allow Andy to use David's account to make purchases for the Lincoln Project, the statements for David's account from January 2013 to January 2014 show that Andy regularly used David's account to buy materials for multiple projects, not just for the Lincoln Project. From S.W. Collins' perspective, Andy's use of David's account in late 2013 and early 2014 was unremarkable. From S.W. Collins' perspective, the account activity during the preference period was consistent with the account activity throughout 2013.

The debts at issue in this proceeding were incurred for the purchase of home construction materials. David was in the business of buying construction materials, and S.W. Collins was in the business of selling such materials. The debts were incurred in arms-length transactions on the same terms as dozens of other trade debts incurred during the prior nine-month period. On these facts, the Court finds and concludes that the debts extinguished by the preferential transfers were incurred in the ordinary course of business of David and S.W. Collins.

### 2.    Transfer Made in the Ordinary Course

To shield the transfers from avoidance, S.W. Collins must also show that the transfers were either made in the ordinary course of business of David and S.W. Collins or "made according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2)(A)-(B). A showing that transfers were made according to ordinary business terms requires proof that the "payments at issue were made 'within the outer limits of normal industry practice.'" Howard v. Bangor Hydro Electric Co. (In re Bangor & Aroostook R.R. Co.), 324 B.R. 164, 172 (Bankr. D. Me. 2005) (quoting In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993)). In this proceeding, S.W. Collins has not adduced any evidence of credit and payment practices within the building

supply industry, or any other industry.  Neither the stipulation nor the exhibits speak to the terms that prevail in industry-wide credit relationships; the evidence all concerns the relationship between David and S.W. Collins.  The question, then, is whether David's payments to S.W. Collins during the preference period were made in the ordinary course of the parties' relationship with one another.  *See* id. at 168.

"To determine whether a transfer was made in the ordinary course, courts focus on the timing of payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was made."  Id.  They also consider the "whether the amount or form of tender differed from past practices" and "whether the debtor or creditor engaged in any unusual collection or payment activities."  Id. (quotation marks omitted).  The determinative consideration is whether the timing of the debtor's payments to the creditor during the preference period was consistent with the timing of the debtor's payments to the creditor during the pre-preference period.  Id. at 169.

In Bangor & Aroostook Railroad Company, a chapter 11 trustee sought to recover preferential transfers made by two railroad company debtors to an electricity company.  324 B.R. at 166.  When the railroads raised the ordinary course of business defense, the trustee argued that the transfers had not occurred in the ordinary course.  Id. at 167-68.  The railroads each maintained multiple accounts with the electricity company.  Id. at 167.  One of the railroads had an account that had been "substantially in arrears at times," and another with an "erratic" payment history, featuring a payment interval of 62.4 days in the preference period and payment interval in the range of 80 days or so in the two quarters preceding the preference period.  Id. at 169.  The other railroad paid its electricity bills every couple of months, with billing-to-payment intervals ranging from 23 days on the low end to 113 days on the high end.  Id. at 170.  The

- 10 -

electricity company routinely employed collection efforts against both railroads during the pre-preference period and the preference period, pursuant to its credit and collection policies. Id. at 170-71. The court determined that the tardiness and inconsistency of the railroads' payments showed a "ragged regularity" in the railroads' relationships with the electricity company, and that the collection methods employed by the electricity company had not been out of the norm in the context of the parties' historical relationships. Id. at 166, 172. The court ultimately determined that the preferential payments had been made in the ordinary course. Id. at 175.

The payments in question in this case show more than a "ragged regularity." They continue a reliable pattern of prompt, full payment by David to S.W. Collins. During the preference period in this case, S.W. Collins continued to invoice David on the last day of each month for purchases within that month, as it had in the preceding nine months. David continued to pay each invoice in full and on time, in order to receive a discount, as he had each month (with the exception of one month) during the preceding nine months. The payments each corresponded to the purchases that had been made on David's account in the prior month. There is no evidence that David engaged in unusual payment activities or that S.W. Collins engaged in unusual collection activities. *Cf.* Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 109-10 (1st Cir. 1997) (concluding that a transfer was not made in the ordinary course when the transfer lumped old and new bills, marked the first time that the debtor had ever paid the creditor all outstanding invoices, and was made after unusual collection activities). These facts all establish that the transfers made during the preference period were consistent with the transfers that David made during the pre-preference period. Inasmuch as

consistency is the hallmark of transfers made in the ordinary course, the transfers at issue here qualify as ordinary. *See* In re Bangor & Aroostook R.R. Co., 324 B.R. at 172.

Because the transfers were made in payment of debts incurred in the ordinary course of business of David and S.W. Collins and were also executed in the ordinary course of business of David and S.W. Collins, they are shielded from avoidance under section 547(c)(2).

### B. Contemporaneous Exchange of New Value

To the extent that a discussion of the contemporaneous exchange of new value defense is warranted, S.W. Collins has not met its burden. The justification for this defense is the recognition that a transfer does not diminish the debtor's net estate when the transfer is made in exchange for something of value sufficient to offset the transfer. *See* Endo Steel, Inc. v. Janas (In re JWJ Contracting Co.), 371 F.3d 1079, 1081 (9th Cir. 2004); Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 969 F.2d 321, 324 (7th Cir. 1992) (looking to and discussing the contemporaneous exchange of new value defense under federal bankruptcy law in the context of a voidable preference dispute under state insurance law).

Whether the parties intended a transfer to be a contemporaneous exchange is a question of fact. Creditors Comm. v. Spada (In re Spada), 903 F.2d 971, 975 (3d Cir. 1990). Substantial contemporaneity is a more nuanced element that is narrowly interpreted in some jurisdictions and subject to a more liberal, case-by-case analysis in others. *See* Peters v. Wray State Bank (In re Kerst), 347 B.R. 418, 424-25 (Bankr. D. Colo. 2006) (discussing "principal debate" in case law as to the meaning of substantial contemporaneity).[5] The element of new value is also mixed question, requiring the court to first determine whether new value was given to the debtor as a matter of law and to then determine the amount of new value given. Miller v. Bodek & Rhodes,

---

[5] In this jurisdiction, substantial contemporaneity is interpreted narrowly when the concept is applied to the transfer of a mortgage. Collins v. Greater Atl. Mortg. Corp. (In re Lazarus), 478 F.3d 12, 17-19 (1st Cir. 2007).

- 12 -

Inc. (In re Adelphia Automatic Sprinkler Co.), 184 B.R. 224, 227 (E.D. Pa. 1995); see Riley v. Nat'l Lumber Co. (In re Reale), 393 B.R. 821, 828 (B.A.P. 1st Cir. 2008) (defining new value and requiring the creditor to "provide a specific dollar valuation" of the new value given).

The trustee asserts that David's payments to S.W. Collins during the preference period were not intended to be, and were not in fact, substantially contemporaneous with any exchange for new value. Specifically, the trustee contends that the details of David's credit relationship with S.W. Collins show that his payments to S.W. Collins were not intended to be, and were not in fact, substantially contemporaneous with David's receipt of materials from S.W. Collins. The trustee also argues that there was no new value given to David because the materials purchased during the preference period were used by Andy on a project that David did not work on.

S.W. Collins responds that the details of its credit relationship with David establish (a) that David and S.W. Collins intended payments within ten days of the statement date to qualify as contemporaneous, and (b) that David in fact made payments to S.W. Collins within ten days of the statement date. S.W. Collins also asserts that it supplied David with "new value" in the form of goods that his son, Andy, used to build a home for his relatives. S.W. Collins explains that David received a "real benefit" by accommodating Andy's ability to earn a living.

It is not necessary to decide whether the details of David's credit relationship with S.W. Collins preclude a finding of substantial contemporaneity. S.W. Collins cannot shield the transfers from avoidance under section 547(c)(1) because the parties' stipulation does not establish the extent of any "new value" that David may have received.

The Code defines new value, in part, as "money or money's worth in goods [or] services." 11 U.S.C. § 547(a)(2). "New value does not consist of 'esoteric or intangible benefits' but instead 'must actually and in real terms enhance the worth of the debtor's estate so

as to offset the reduction in the estate that the transfer caused.'" In re Adelphia Automatic Sprinkler Co., 184 B.R. at 228 (quoting Aero-Fastener, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.), 177 B.R. 120, 138 (Bankr. D. Mass. 1994)).  The parties' stipulation and the attached exhibits establish that many of the materials purchased from S.W. Collins during the preference period did not replenish the debtors' estates.  Many of the materials were used by Andy to construct a home for the debtors' relatives.  Perhaps the debtors were gratified by their son's construction of a house for a family member.  However, gratification is not a tangible, economic benefit sufficient to offset preferential payments.  It does not constitute money or money's worth in goods or services and therefore does not constitute new value within the meaning of section 547(c).  And, although the stipulation might permit an inference that David received "new value" when Emery paid the invoices that David sent for the materials committed to the Lincoln Project, *see* Instrumentation & Controls, Inc. v. Ne. Union, Inc. (In re Instrumentation & Controls, Inc.), 506 B.R. 677, 679 (Bankr. E.D. Pa. 2014) (discussing indirect transfer theory of new value defense), S.W. Collins did not establish the amount of Emery's payments to David, and failed to raise this theory or develop it with sufficient detail.

### III.    CONCLUSION

Judgment will enter against the trustee and in favor of S.W. Collins on all counts of the trustee's complaint [Dkt. No. 1].  No costs will be awarded.

Dated:   September 11, 2017

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine